## UNITED STATES DISTRICT COURT
## DISTRICT OF COLORADO

| | |
|---|---|
| JAMES O'CONNOR, Derivatively on behalf of CROCS, INC., <br><br> Plaintiff, <br><br> v. <br><br> THOMAS J. SMACH, ANDREW REES, RONALD L. FRASCH, CHARISSE FORD HUGHES, BETH J. KAPLAN, IAN M. BICKLEY, DOUGLAS J. TREFF, JOHN REPLOGLE, NEERAJ TOLMARE, ANNE MEHLMAN, and SUSAN HEALY, <br><br> Defendants, <br><br> and <br><br> CROCS, INC., <br><br> Nominal Defendant. | Case No. <br><br><br><br><br><br> **JURY TRIAL DEMANDED** |

Plaintiff James O'Connor ("Plaintiff"), by his attorneys, brings this Complaint derivatively on behalf of Nominal Defendant Crocs, Inc. ("Crocs" or the "Company"). Plaintiff bases his allegations on personal knowledge and, as to all other matters outside his personal knowledge, upon information and belief based on the investigation of counsel, which includes without limitation: (i) review and analysis of public filings with the United States Securities and Exchange Commission ("SEC"); (ii) review and analysis of filings in state and federal court, including pleadings in the related securities fraud class action pending in the U.S. District Court for the District of Delaware, *Carretta v. Crocs, Inc. et al.*, No. 25-cv-00096 (the "Securities Class

Action"); and (iii) review and analysis of press releases, news reports, analysis reports, industry reports, investor conference call transcripts, and other information available in the public domain.

## SUMMARY OF THE ACTION

1.      Crocs, a casual lifestyle footwear brand, announced in December 2021 that it was planning to acquire privately held HEYDUDE for $2.5 billion. HEYDUDE is a footwear brand focusing on casual, comfortable, and lightweight footwear. Crocs completed its acquisition of HEYDUDE on February 17, 2022.

2.      Despite the fact that HEYDUDE was only acquired by Crocs in mid-February 2022, HEYDUDE accounted for approximately 25% of the Company's total revenues in 2022.

3.      This action alleges that that the strong revenue growth exhibited by the Company's HEYDUDE brand following its acquisition in February 2022 was largely driven by a conscious decision on the part of Crocs management to aggressively stock its third-party wholesaler pipeline with HEYDUDE products, regardless of the level of retail demand being experienced by those wholesalers.

4.      The Individual Defendants (defined herein) pursued this overstocking strategy despite assurances to investors by Defendant Andrew Rees, the Company's Chief Executive Officer, that Crocs would not "play the game of forcing inventory into [wholesalers] and getting them overstocked."  As a result, unbeknownst to investors, the Company reported HEYDUDE revenue numbers in 2022 that were not indicative of actual retail demand for HEYDUDE shoes and, over the longer term, were entirely unsustainable.  Moreover, after the Company's retail partners began to destock this excess inventory, the Individual Defendants further misled investors by concealing that waning product demand for HEYDUDE shoes would further impact the Company's financial results.

5.    Investors began to learn the truth about the nature and unsustainability of HEYDUDE's revenue growth on April 27, 2023, when Defendant Rees revealed during the Company's first quarter 2023 earnings call that much of HEYDUDE's revenue growth in 2022 was attributable to efforts to stock the Company's wholesale partners with HEYDUDE products and was not necessarily indicative of actual downstream retail sales.

6.    On this news, the price of Crocs common stock declined $23.46 per share, or nearly 16%.

## JURISDICTION AND VENUE

7.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(2) in that Plaintiffs and Defendants are citizens of different states and the matter in controversy exceeds $75,000.00, exclusive of interests and costs.  This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. §1367(a).  This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

8.    This Court has jurisdiction over each Defendant because they reside in this district or have sufficient minimum contacts with this district to render the exercise of jurisdiction by the Court permissible under traditional notions of fair play and substantial justice. The Court has personal jurisdiction over the Nominal Defendant because it is authorized to do business in this state, has consented to service in this state and its principal place of business is within this district.

9.    Venue is proper in this district pursuant to 28 U.S.C. § 1391 because one or more of the Defendants either resides in or maintains offices in this district, a substantial portion of the transactions and wrongs complained of herein, including the Individual Defendants' (defined below) primary participation in the wrongful acts detailed herein and violation of fiduciary duties owed to Domino's occurred in this district, and Individual Defendants have received substantial

3

compensation in this district by doing business here and engaging in numerous activities that had an effect in this district.

## PARTIES

10.     Plaintiff is a current shareholder of Crocs and has continuously held Crocs common stock since October 17, 2022.  Plaintiff is a citizen of Arizona.

11.     Defendant Crocs is a Delaware corporation headquartered at 500 Eldorado Blvd., Building 5, Broomfield, Colorado, 80021.

12.     Defendant Thomas J. Smach ("Smach") has served as a director of the Company since April 2005 and Chair of the Board of Directors since June 2011. During the events complained of herein, Smach served as a member of the Board's Audit Committee. Upon information and belief, Smach is a citizen of Florida.

13.     Defendant Andrew Rees ("Rees") has served as a director of the Company and the Company's CEO since June 2017.  Upon information and belief, Rees is a citizen of Colorado.

14.     Defendant Ronald Frasch ("Frasch") has served as a director of the Company since October 2006. Upon information and belief, Frasch is a citizen of New York.

15.     Defendant Charisse Ford Hughes ("Hughes") has served as a director of the Company since October 2020. Upon information and belief, Hughes is a citizen of Florida.

16.     Defendant Beth J. Kaplan ("Kaplan") has served as a director of the Company since January 2020. Upon information and belief, Kaplan is a citizen of Florida.

17.     Defendant Ian M. Bickley ("Bickley") has served as a director of the Company since April 2015. During the events complained of herein, Bickley served as a member of the Board's Audit Committee. Upon information and belief, Bickley is a citizen of New York.

18.     Defendant Douglas J. Treff ("Treff") has served as a director of the Company since June 2016.  During the events complained of herein, Treff served as the Chairperson of the Board's Audit Committee. Upon information and belief, Treff is a citizen of Washington.

19.     Defendant John Replogle ("Replogle") has served as a director of the Company since January 2024.  Upon information and belief, Replogle is a citizen of North Carolina.

20.     Defendant Neeraj Tolmare ("Tolmare") has served as a director of the Company since January 2024. During a material amount of the events complained of herein, Tolmare served as a member of the Board's Audit Committee.  Upon information and belief, Tolmare is a citizen of Georgia.

21.     Defendant Susan Healy ("Healy") is the Company's Executive Vice President and Chief Financial Officer since June 3, 2024.  Upon information and belief, Healy is a citizen of Colorado.

22.     Defendant Anne Mehlman ("Mehlman") was the Company's Executive Vice President and Chief Financial Officer until June 3, 2024, and is the Company's Executive Vice President and Crocs Brand President since May 3, 2024. Upon information and belief, Mehlman is a citizen of Colorado.

23.     Defendants Smach, Rees, Frasch, Hughes, Kaplan, Bickley, Treff, Replogle, Tolmare, Healy and Mehlman are collectively referred to herein as the "Individual Defendants."

### INDIVIDUAL DEFENDANTS' DUTIES

24.     By reason of their positions as officers, directors, and/or fiduciaries of Crocs, and because of their ability to control the business and corporate affairs of Crocs, the Individual Defendants owed Crocs and its shareholders fiduciary obligations of good faith, loyalty and

candor, and were and are required to use their utmost ability to control and manage Crocs in a fair, just, honest and equitable manner.

25.     Further, Individual Defendants were and are required to act in furtherance of the best interests of Crocs and its shareholders so as to benefit all shareholders equally, and not in furtherance of their personal interest and benefit.  Each director and officer of the Company owes to Crocs and its shareholders the fiduciary duty to exercise good faith and due diligence in the administration of the Company's affairs, and in the use and preservation of its property and assets, as well as the highest obligation of fair dealing.

26.     Because of their positions of control and authority as directors and/or officers of Crocs, having knowledge of material non-public information regarding the Company, the Individual Defendants were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.  To discharge their duties, the officers and directors of Crocs were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company.  By virtue of such duties the officers and directors of Crocs were required to, among other things:

  a.  Exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business;

  b.  Exercise good faith to ensure that the Company was operated in a diligent, honest and prudent manner, and complied with all applicable federal and state laws, rules, regulations and requirements, and all contractual obligations, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the investing public; and

  c.  When put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

27.     As members of the Audit Committee, defendants Tolmare, Treff, Bickley and Smach (the "Audit Committee Defendants") were charged in the Audit Committee Charter with the following responsibilities:

### *Oversight of Financial Reporting, Internal Control and Disclosure Matters*

- Review and discuss with management and the independent auditor the Company's annual audited financial statements prior to the filing of the Company's Form 10-K and recommend to the Board whether the audited financial statements should be included in the Company's Form 10-K.

- Review and discuss with management and the independent auditors, prior to the filing of the Company's Form 10-Q, the Company's quarterly financial statements, including the results of the independent auditors' review of the quarterly financial statements and the disclosure under "Management's Discussion and Analysis of Financial Condition and Results of Operations".

- Oversee (i) the determination of whether an accounting restatement is required due to the material noncompliance of the Company with any financial reporting requirement under the securities laws and (ii) the preparation of the Company's accounting restatements to correct such noncompliance.

*** 

- Review with the full Board any material issues that arise with respect to the quality or integrity of the Company's financial statements, the Company's compliance with legal or regulatory requirements, and the performance and independence of the Company's independent auditors

***

- Monitor compliance with the Worldwide Code of Ethics.

***

- Discuss policies with respect to risk assessment and risk management, including appropriate guidelines and policies to govern the process, as well as the company's major financial risk exposures and the steps management has undertaken to control them.

***

- Review and oversee that management has effective processes in place for evaluating, approving and executing major business / information technology initiatives.

## SUBSTANTIVE ALLEGATIONS

28.     In December 2021, the Company announced that it was planning to acquire privately held HEYDUDE for $2.5 billion.  Crocs completed its acquisition of HEYDUDE on February 17, 2022.  After the acquisition, Crocs reported sales attributable to HEYDUDE in two

segments: DTC sales; and wholesale sales (which include sales to major retailers).  HEYDUDE accounted for approximately 25% of the Company's total revenues in 2022 ($896 million out of $3.55 billion).

29.    On November 3, 2022 of the Company's third quarter 2022 financial results. Among other things, the Company reported HEYDUDE quarterly revenues of $269.4 million (including wholesale revenues of $181.8 million and DTC revenues of $87.6 million)— representing approximately 87% year-over-year growth.  Defendant Rees attributed the Company's "exceptional third quarter results, including record revenue," to "the strength of the Crocs and HEYDUDE brands."  In issuing its full year 2022 financial outlook, the Company announced that it expected HEYDUDE revenues of "approximately $850 [million] to $890 million on a reported basis, implying $940 [million] to $980 million [on a pro forma basis], including the period of time prior to the closing of the acquisition."

30.    During the accompanying earnings call held that same day, Defendant Rees praised HEYDUDE as "one of the fastest-growing casual footwear brands in the U.S. market today," citing Piper Sandler's fall 2022 "Taking Stock with Teens" survey in which "HEYDUDE ascended to the #7 favorite footwear brand among teens, up from #8 in the fall of 2021 and #9 in the spring of 2022."  In concluding his prepared remarks, Defendant Rees expressed management's "tremendous confidence and clear evidence as to the underlying strength and growth potential for both [Crocs] and the HEYDUDE brands."  Defendant Rees noted that the Company was expanding HEYDUDE's footprint and focusing on "expand[ing] distribution" and "greater shelf presence for the brand in the future."  Addressing a question regarding sales of HEYDUDE products to wholesalers, Rees assured investors:

> [A]s we approach our kind of wholesale partner management, ***we try and be really disciplined in terms of what inventory did they hold and making sure that they're***

*seeing strong sell-throughs*.  As I mentioned, U.S. wholesale sellout was up high single digits.  So that's over the same period last year.  So we had actually strong consumer demand and strong sell-out.  ***But I think what we're seeing is our wholesale customers are being really prudent in terms of how they manage their business in terms of managing their overall inventory levels and we're not going to play the game of forcing inventory into them and getting them overstocked***.

(Emphasis added).

31.     On February 16, 2023, the Company announced its fourth quarter and full year 2022 financial results, and reported that it expected full year 2023 HEYDUDE revenue growth of mid-20%.  During the accompanying earnings call held that same day, Defendant Rees highlighted that HEYDUDE "revenues in 2022 grew 70% on a pro forma basis, driven by wholesale partner expansion in the United States," and Defendant Mehlman added that fourth quarter 2022 HEYDUDE revenues were $279 million, a year-over-year increase of 36.6%.  In an exchange with an analyst, Defendant Rees touted HEYDUDE's "really good progress" with respect to "wholesale door penetration," which "has fueled our growth."   Further, Defendant Mehlman reassured investors that, even though HEYDUDE inventory was "slightly elevated," allegedly from "pre-acquisition purchases," ***"[o]ur entire team is extremely focused on inventory health, especially as we grow."*** (Emphasis added).

## THE TRUTH EMERGES

32.     Investors began to learn the truth about the nature and unsustainability of HEYDUDE's revenue growth on April 27, 2023, when Crocs announced its first quarter 2023 financial results, reporting HEYDUDE quarterly revenue of just $235.4 million.  During the accompanying earnings call held that same day, Defendant Rees acknowledged that HEYDUDE's quarterly revenue represented only 15% growth on a pro-forma basis and explained that HEYDUDE's quarterly revenue growth comparisons would be challenging, stating:

The other thing that's also important to bear in mind as you look to future quarters is the -- we had significant pipeline fills. So we opened a lot of big national accounts last year in Q2 and Q3. So when you open a big national account and you pipeline fill 400, 500, 600 doors, that's a significant amount of volume that you don't anniversary the following year. So you've also got to take that into consideration in Q2 and Q3.

33.    Nevertheless, Defendant Rees sought to reassure investors, stating that the Company was "well positioned in market with good inventories in many of our leading strategic wholesale customers," was "super confident in our kind of mid-20s growth rate that we've guided for the brand for the full year," and that its "inventory turning is performing well."

34.    A few weeks later, on June 7, 2023, the truth about the nature and unsustainability of HEYDUDE's revenue growth was further revealed when Defendants Rees and Mehlman attended the Robert W. Baird Global Consumer, Technology & Services Conference. At the conference, Defendant Rees more clearly revealed than he had on April 27, 2023, that a large portion of HEYDUDE's 2022 revenue growth was not immediately repeatable given that it was actually attributable to efforts to overstock HEYDUDE products at major wholesalers and retailers. Specifically, Defendant Rees explained:

A big part of that growth last year was pipeline fill for some of those major US retailers that we were able to expand the brand into. And I think on the left-hand side of this slide, what we're trying to highlight and break out for you all is the non-comp version. ***That's the pipeline fill. So $70 million in [the second quarter], $60 million in [the third quarter] of 2022 was pipeline fill***.

So when you're filling a major retailer, so take a [F]amous [F]ootwear or somebody with [a] thousand stores, and you're putting a significant number of SKUs on the shelf and you're putting a size run of each SKU in each store, obviously it adds up to a lot of units. And you don't sell through that all immediately. So what we're trying to highlight is a period here that . . . we won't be comping this year.

I would say that pipeline fill, you could say, well, why wouldn't you do that more gradually over a number of years and smooth out the growth? ***It was a very conscious decision on our part to do that last year because we're very much aware that there is competition out in the marketplace.*** There are people selling a

HEYDUDE knockoff or something that's very similar.  And there are many of these retailers had private label -- there was similar product on the shelf.

We knew our product will perform better and we wanted to secure that shelf space for the HEYDUDE brand.  So that was a conscious decision we made.  I think we probably could have done a better job being a little clear about that but . . . *that was a conscious decision we made.*

(Emphasis added).

35.     Later during the presentation, Defendant Rees again apologized for the fact that "we didn't do a good enough job explaining" the significance of the Company's pipeline filling activity and confirmed that "the net of that is we'd actually expect the US wholesale business in [the second quarter] and [the third quarter] of this year to be negative."  Defendant Rees also acknowledged that data on inventory levels was readily available to management, stating that Crocs's "*major US wholesale accounts [send] . . . weekly tracking information on sellouts and inventory on hand*"—giving the Company "*a lot of visibility and transparency.*" (Emphasis added).

36.     On this news, the price of Crocs common stock declined $4.52 per share, or nearly 4%, from a close of $121.09 per share on June 7, 2023, to close at $116.57 per share on June 8, 2023.

37.     On July 27, 2023, in conjunction with the announcement of its second quarter 2023 financial results, Crocs reported that HEYDUDE "[w]holesale revenues declined 8.4% to $148.8 million following pipeline fill in the same period last year."  In explaining the impact of the Company's "very conscious decision" to fill the wholesale pipeline in 2022, Defendant Rees reiterated that "pipeline fill was $70 million for the second quarter of last year and $220 million in fiscal [2022]."  As a result of the Company's overstocking of wholesalers in 2022, Defendant Rees announced that, for the remainder of 2023, "[w]holesale growth is expected to be low," and

Defendant Mehlman stated that the Company was now slashing expected HEYDUDE revenue growth from the previously-announced mid-20's range to between 14% and 18%.

38.    On this news, the price of Crocs common stock declined $17.50 per share, or nearly 15%, from a close of $119.80 per share on July 26, 2023, to close at $102.30 per share on July 27, 2023.

39.    On August 16, 2023, Williams Trading significantly cut its price target on Crocs from $145 per share, to $113 per share, due to near-term wholesale concerns for HEYDUDE.  As a result of discussions that Williams Trading analyst Sam Poser had with several HEYDUDE wholesale accounts at the Atlanta Shoe Market trade show, Williams Trading highlighted elevated HEYDUDE inventory levels at approved retailers and the "overabundance" of HEYDUDE products on Amazon.com at below suggested retail price.

40.    On this news, the price of Crocs common stock declined $3.79 per share, or nearly 4%, from a close of $97.80 per share on August 15, 2023, to close at $94.01 per share on August 16, 2023.

41.    On November 2, 2023, Crocs announced its financial results for the third quarter of 2023 and revealed that HEYDUDE wholesale revenue declined 19.4% year-over-year "following prior year pipeline fill and as our wholesale partners were more cautious on at-once orders." Critically, despite the fact that HEYDUDE DTC sales in the third quarter grew 14.6% year-over-year, the Company was forced to further cut its 2023 HEYDUDE revenue growth guidance from between 14% and 18% on a reported basis, to between 4% and 6% on a reported basis.

42.    During the Company's accompanying investor call held that same day, Defendant Rees further admitted that, despite his prior assurances regarding inventory levels, HEYDUDE's "inventory was too high" and that the Company "is proactively lowering in-channel inventories"

and "working with our strategic accounts to clean up that inventory and putting them in a strong sell-through and a more profitable position." Additionally, Defendant Rees acknowledged that the Company "anticipate[s] that wholesale sales . . . will be down in the first part of [2024]" as well.

43.    On this news, the price of Crocs common stock declined $4.62 per share, or more than 5%, from a close of $87.41 per share on November 1, 2023, to close at $82.79 per share on November 2, 2023.

44.    Defendants continued to downplay the impact of the Company's overstocking of third-party wholesalers and retailers following the February 2022 acquisition of HEYDUDE. Specifically, Defendants further misled investors by concealing that, in addition to the overstocking problem, waning product demand would further negatively impact the Company's financial results.

45.    On February 15, 2024, the Company announced fourth quarter and full year 2023 results and its outlook for 2024. During the accompanying earnings call held that same day, Defendant Rees was optimistic about HEYDUDE's trajectory in 2024, proclaiming that, based on third-party data, "HEYDUDE brand during 2023 gained [substantial] market share in the fashion casual category." Additionally, Defendant Rees, while acknowledging that "we had too many accounts with too much inventory kind of competing against each other," sought to reassure investors that the Company has "gone through the process of cleaning up our account base because [of] . . . too much inventory." Defendant Rees added that "as we talk to those strategic partners" about HEYDUDE, "they are really bullish on the brand."

46.    On April 16, 2024, the Company announced its separation from Rick Blackshaw, Executive Vice President and Brand President for HEYDUDE.

47.    On this news, the price of Crocs common stock declined $2.68 per share, or approximately 2.2%.

48.    On May 7, 2024, the Company announced its financial results for the first quarter of 2024.  During the accompanying earnings call held that same day, Defendant Rees touted that HEYDUDE performed ahead of expectations for the quarter, indicating that Crocs was "pleased with the work we have done to clean up our [wholesale] account base" and highlighting that "HEYDUDE was the #8 preferred footwear brand" according to Piper Sandler's spring 2024 survey.  Defendant Mehlman acknowledged that HEYDUDE sales were down 17% from the prior year and wholesale revenue was down 20%, but claimed that Crocs expected "HEYDUDE sales trends to improve each quarter [in 2024]" and for the wholesale "sell-in and sell-through dynamic to normalize into [the fourth quarter]."  Defendant Mehlman further acknowledged that the Company expected HEYDUDE sales to be down 17% to 19% for the second quarter of 2024 compared to the second quarter of 2023, and down 8% to 10% for full year 2024 compared to full year 2023.

49.    On August 1, 2024, the Company announced its financial results for the second quarter of 2024.  During the accompanying earnings call held that same day, Defendant Rees, while admitting that HEYDUDE's wholesale business "remain[ed] challenging," trumpeted HEYDUDE's overall performance in the quarter, explaining that Crocs made progress in "improving the health of our underlying business in North America, exemplified by pricing on digital up versus prior year, solid recovery in gross margins[,] and our inventories turning in excess of 4 times."  Moreover, he reassured investors that, despite its wholesale channel issues, Crocs was "focus[ed] on energizing the brand through improved marketing effectiveness and new product introductions."

50.    Investors more fully learned the truth about HEYDUDE's prospects on October 29, 2024, when the Company reported its financial results for the third quarter of 2024.  During the accompanying earnings call held that same day, Defendant Rees disclosed that HEYDUDE revenues fell below the reduced expectations that Defendants had communicated in the prior quarters and revealed that "HEYDUDE's recent performance and the current operating environment are signaling it will take longer than we had initially planned for the business to turn the corner."  Defendant Rees attributed HEYDUDE's struggles to "***excess inventories in the market***" and admitted that "we've made good progress, but frankly, not quite all the progress we want to make" in resolving the excess inventory issue.  Defendant Healy additionally explained that revenue expectations for HEYDUDE would be decreased due to "lower-than-expected sellouts on both digital and wholesale."  Defendant Rees conceded that "if you think about this sort of [20]22 into [20]23 timeframe, in retrospect, we absolutely shipped too much product[],"underscoring that the decision was "wrong" and highlighting that a lack of product demand exacerbated the issue.

51.    Reacting to the news, on October 29, 2024, analysts at UBS Securities LLC reiterated their Neutral rating of the stock and cut their price target from $146.00 to $122.00, explaining that "HEYDUDE is losing traction with consumers."

**INSIDER SALES**

52.    The fall in stock price did not hurt several Company insiders, who since the acquisition of Crocs, and while well aware of management's "conscious decision" to overstock inventory channels, sold material amounts of their Crocs common stock for substantial profits.  Specifically, defendants Treff, Mehlman, Rees, Smach, and Bickley (the "Insider Trading

Defendants") all sold Crocs. stock at inflated levels while in possession of material nonpublic information and while breaching their respective fiduciary duties to Crocs.

53.    In sum, the Insider Trading Defendants reaped nearly $20 million due to their illicit sales.  The below chart details each of the Insider Trading Defendants' trading:

| Seller | Trade Dates | Shares Sold | | Proceeds |
|---|---|---|---|---|
| Treff | 8/8/2024 | 10,594 | $ | 1,402,381 |
| | 2/23/2024 | 8,997 | $ | 1,061,507 |
| | *Total:* | | *$* | *2,463,888* |
| Mehlman | 6/17/2024 | 7,150 | $ | 1,136,916 |
| | 1/13/2023 | 10,000* | $ | 1,256,739 |
| | *Total:* | | *$* | *2,393,655* |
| Rees | 6/17/2024 | 10,000 | $ | 1,601,507 |
| | 4/24/2023 | 10,000* | $ | 1,500,546 |
| | 4/18/2023 | 20,000* | $ | 2,804,583 |
| | 2/17/2023 | 20,000 | $ | 2,615,476 |
| | 11/30/2022 | 10,000 | $ | 1,000,001 |
| | 11/18/2022 | 10,000 | $ | 1,005,500 |
| | *Total:* | | *$* | *10,527,613* |
| Smach | 5/10/2024 | 10,174 | $ | 1,427,577 |
| Bickley | 2/23/2024 | 3,215 | $ | 381,203 |
| | 2/16/2024 | 16,785 | $ | 2,014,958 |
| | 2/17/2023 | 5,516 | $ | 738,720 |
| | *Total* | | *$* | *3,134,881* |

*Represent trade made pursuant to 10b5-1 plan

## DERIVATIVE ALLEGATIONS

54.    Plaintiff brings this action derivatively in the right and for the benefit of Crocs to redress the Individual Defendants' breaches of fiduciary duties and violations of law.

55.    Plaintiff is a current Crocs stockholder, has continuously held shares of Crocs stock since October 17, 2022 and was a stockholder of Crocs at all times relevant to the wrongdoing as alleged herein.

56.    Plaintiff will adequately and fairly represent Crocs' interests and those of its stockholders in enforcing and prosecuting the Company's rights.

57.    At the time this action was commenced, the Board consisted of the following nine (9) directors: defendants Smach, Rees, Frasch, Hughes, Kaplan, Bickley, Treff, Replogle, and Tolmare.

58.    Defendant Rees' primary occupation throughout the conduct complained of herein was as Crocs' CEO pursuant to which he has received substantial monetary compensation and other benefits.  The Board has acknowledged Rees' lack of independence, noting in the Company's April 23, 2024 Proxy Statement filed with the SEC that Rees cannot be classified as an independent director

59.    As members of the Audit Committee, the Audit Committee Defendants face a substantial likelihood of liability for their failure to properly oversee the risk assessment function of the Audit Committee and ensure compliance with the Company's Code of Ethics. Critically, the Audit Committee Defendants were charged with the oversight of the Company's risk management internal controls, the failure of which, led to the allegations herein.

60.    Each member of the Board faces a substantial likelihood of liability for authorizing and/or permitting false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

## COUNT I

### Against the Individual Defendants for Breach of Fiduciary Duties

61.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

62.    As alleged in detail herein, each of the Individual Defendants violated and breached their fiduciary duties of loyalty and good faith by causing or allowing the Company to disseminate to Crocs shareholders materially misleading and inaccurate information through, inter alia, SEC filings, press releases, conference calls and other public statements and disclosures as detailed herein.  These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

63.    As alleged in detail herein, each of the Individual Defendants had a fiduciary duty to, among other things, exercise good faith to ensure that the Company's internal controls were properly functioning, and, when put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

64.    The Individual Defendants willfully ignored the pervasive problems with Crocs internal controls and practices and procedures necessary to protect the Company and failed to make a good faith effort to correct these problems or prevent their recurrence.

65.    As a direct and proximate result of the Individual Defendants' foregoing breaches of fiduciary duties, the Company has suffered significant damages.  Thus, as a result of the misconduct alleged herein, Individual Defendants are liable to the Company.

## COUNT II

### Against the Individual Defendants for Unjust Enrichment

66.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

67.     By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of Crocs.

68.     Plaintiff, as a shareholder and representative of Crocs, seeks restitution from the Individual Defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by the Individual Defendants, and each of them, as a result of their wrongful conduct and fiduciary breaches.

## COUNT III

### Against the Insider Trading Defendants for Insider Selling

69.     Plaintiff, incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

70.     The Insider Trading Defendants each owed fiduciary duties of loyalty and good faith to the Company and is bound by its Code of Conduct. Despite this, the Insider Trading Defendants would sell thousands of shares for proceeds of nearly $20 million.

71.     In their positions as directors and officers of Crocs, the Insider Trading Defendants were aware at all relevant times of the specifics of the Company's relationship with, and reliance on, Pepsi's distribution network.

72.     The Insider Trading Defendants made these sales while in possession of inside information and that the Company had routinely made false and misleading statements in its public disclosures, as detailed above.

73.     The Insider Trading Defendants knew this was information the market would consider material and that it was virtually certain to harm the Company's stock price and made these sales before disclosing this material information to the public.

74.     By selling his stock while in possession of adverse, material non-public information, The Insider Trading Defendants exploited their respective positions, breached their fiduciary duties, and violated the Company's Code of Conduct. Because the Insider Trading Defendants sold their stock before the non-public information in their possession could be publicly disclosed and harm the Company's stock price, the Insider Trading Defendants improperly benefited from this breach of fiduciary duty and the Company is entitled to damages and the imposition of a constructive trust on any profits obtained thereby.

75.     Plaintiff, on behalf Crocs, has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.     Declaring that Plaintiff may maintain this derivative action on behalf of Crocs and that Plaintiff is a proper and adequate representative of the Company;

B.     Against the Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties;

C.     Directing Crocs to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable law and to protect the Company and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before

shareholders for a vote a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

D.      Awarding to Crocs restitution from the Individual Defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by the Individual Defendants;

E.      Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs and expenses; and

F.      Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated: February 21, 2025                    Respectfully submitted,

**THE WEISER LAW FIRM, P.C.**

*s/ James M. Ficaro*
JAMES M. FICARO
jficaro@weiserlawfirm.com
JOHN J. GROSS
jgross@weiserlawfirm.com
Four Tower Bridge 200
Barr Harbor Drive, Suite 400
West Conshohocken, PA 19428
Telephone: (610) 225-2677

**RM LAW, P.C.**
RICHARD A. MANISKAS
1055 Westlakes Drive
Suite 300
Berwyn, PA 19312
Tel.: 484/324-6800
Fax: 484/631-1305
rmaniskas@rmclasslaw.com